FILED

2006 Oct-12  PM 01:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **LOIS SAYER,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  7:05-CV-1423-RDP** |
| | } | |
| **LINCOLN NATIONAL LIFE** | } | |
| **INSURANCE COMPANY,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

### I.    Introduction

The court has before it Defendant's Motion to Dismiss or for Summary Judgment (Doc. #

50) filed on June 22, 2006 and Defendant's Motions to Strike the Affidavits of Cutlip and Ryles

(Docs. # 57, 58) filed on July 24, 2006.  The motion to dismiss or for summary judgment came under

submission July 24, 2006 and the motions to strike were under submission August 3, 2006.  On

September 1, 2006, the court ordered the parties to brief four additional issues in the Order Setting

Briefing Schedule  (Doc. # 63).  The court appreciates the parties' timely responses.  (Docs. # 64,

# 65).  As discussed below, Defendant's Motion to Dismiss or for Summary Judgment is due to be

granted, thereby making Defendant's Motions to Strike the Affidavits of Cutlip and Ryles moot.

### II.    Statement of Facts

On March 4, 1999, Ms. Lois Sayer ("Plaintiff") purchased an Investors Choice Annuity

("Annuity") in the amount of $10,000, which is an insurance product that was designed,

administered, and sold by Lincoln National Life Insurance Company ("Lincoln" or "Defendant")

through its agent AmSouth Bank ("AmSouth").  (Doc. # 44 Ex. 1 at 17–21; Doc. # 52, Ex. A at ¶

6).  The Annuity was a bonus fixed-rate annuity that earned a bonus rate of interest above the base rate in the first year and, thereafter, provided for annual renewal rates set by Lincoln, which were fixed for one year and subject to a minimum 3.0% guaranteed rate.  (Doc. # 52 Ex. C at ¶ 3).  The pricing structure of the Annuity contemplated that Defendant would invest annuity deposits and would recover its expenses out of the investment earnings after covering all of its costs, such as the interest rates paid to annuitants' accounts.  (Doc. # 52 Ex. C at ¶ 5).  In connection with that purchase, Plaintiff signed disclosure forms indicating that she had been made aware of certain salient features of the Annuity, including the following:  (1) the first-year interest rate was 5.95% consisting of a base rate of 4.95% and 1.0% bonus;  (2) the minimum guaranteed rate was 3.0% after the first year and these "renewal rates" would be set by Lincoln and would not include the "bonus rate" of 1.0%;  (3) there was an 8.0% surrender charge which would decline over six years; and (4) the principal of the investment was guaranteed by Lincoln. (Doc. # 52 Ex. A at 23; Doc. # 52 Ex. A at 31–45; Doc. # 44 Ex. 1 at 41-42; Doc. # 52 Ex. A at ¶ 7).  Thus, contractually, Defendant promised to credit Plaintiff's Annuity account with interest at a rate of 5.95% in the first year, and thereafter at a rate equal to or greater than 3.0%.  (Doc. # 52 Ex. A at 23).  Records generated by Defendant and sent to Plaintiff, the authenticity of which are not in dispute, reflect that Plaintiff received 5.95% interest in the first year, which included the 1.0% "bonus rate," and 4.95% in the second year and prorated portion of the third year.  (Doc. # 52 Ex. A at 3–4, 46–52).

Less than a month into the third year of the Annuity, on March 22, 2001, Plaintiff submitted a surrender form to cash out 100% of the account value of her Annuity.  (Doc. # 52 Ex. A at 5, 15).  Defendant processed the surrender form on or about April 4, 2001, crediting interest at the 4.95%

declared rate up through the surrender date.[1]  (Doc. # 52 Ex. A at 5, 48–54).  In processing the surrender, Defendant gave Plaintiff credit for the ten per cent contractual right of free withdrawal, and calculated the surrender charge on the remaining account value, taking into consideration that the principal was guaranteed.  (Doc. # 52 Ex. A at 5, 48–54).  Plaintiff was then issued a surrender check in the amount of $10,464.54.  (Doc. # 52 Ex. A at 5, 53–54).  The only charge or deduction to Plaintiff's Annuity was for the contractual surrender charge, which was calculated strictly in accordance with the contractual terms of the Annuity.  (Doc. # 52 Ex. A at 5–6, 31–45, 48–54).  Therefore, after contractual surrender charges, Plaintiff received all interest credited to her account, including all of the bonus interest, per the terms of the Annuity contract.  (Doc. # 52 Ex. A at 6, 23, 31–45, 48–54).   On her contractual surrender form, Plaintiff stated that she was surrendering the Annuity because she misunderstood or was dissatisfied with the product.  (Doc. # 52 Ex. A at 6, 15).  Plaintiff has repeatedly testified that she surrendered the Annuity because, as of March 2001, she had concluded that she had not been told the truth and had been deceived about her purchase of the Annuity.  (Doc. # 44 Ex. 1 at 60, 81, 137–38, 149–50).

## III.    Standard of Review

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  FED. R .CIV. P. 56(c).  The substantive law will identify which facts are material and which are irrelevant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir.

---

[1]In fact, Defendant credited Plaintiff's account for an additional two days' interest, through the weekend, which is the practice in the industry.  (Doc. # 52 Ex. A at 52).

1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson,* 477 U.S. at  248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  *See id.* at 249.  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  *See id.* at 324.

The method used by the party moving for summary judgment to discharge its initial burden on the motion depends on whether that party bears the burden of proof on the issue at trial.  *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; *i.e.*, facts that would entitle it to a directed verdict if not controverted at trial.  *See Fitzpatrick*, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to

prove her case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial.  But it does not require evidence negating the non-movant's claim; it simply requires that the movant point out to the district court that there is an absence of evidence to support the non-moving party's case.  *See Fitzpatrick*, 2 F.3d at 1115–16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

Since it appears in this case that there is no genuine issue of material fact, the court finds summary judgment appropriate.  After reviewing all of the pleadings and evidence submitted by the parties, the court determines that Defendant is entitled to judgment as a matter of law.

## IV.     Discussion

### A.     Lincoln Did Not Breach the Contract with Plaintiff.

In Count Six of her Second Amended Complaint (Doc. # 49), Plaintiff alleges that Defendant breached the Annuity contract (Doc. # 52 Ex. A 31–45) entered into March 4, 1999 when Plaintiff signed the Fixed Annuity Purchase Authorization Form ("Authorization") (Doc. # 52 Ex. A at 23).

In order to state a claim for breach of contract, "the claimant must prove: (1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages." *S. Med. Health Sys., Inc. v. Vaughn*, 669 So. 2d 98, 99 (Ala. 1995); *see also McGinney v. Jackson*, 575 So. 2d 1070, 1071–72 (Ala.1991); *Seybold v. Magnolia Land Co.*, 376 So. 2d 1083, 1085 (Ala.1979); *Hanby v. Campbell*, 132 So. 893, 894 (Ala. 1931). Defendant contends Plaintiff cannot establish the third and fourth elements of her contract claim, and the court will discuss each of those assertions in turn.

### 1.  Defendant Fully Performed Under the Annuity Contract.

Plaintiff's theory in this case is that Defendant breached the Annuity contract by "recouping" or "taking back" the bonus rate of interest promised Plaintiff in the initial Authorization. In support of its argument Plaintiff offers the affidavits of two experts (Doc. # 55 Exs. 6 & 7), cites to testimony of various witnesses (Doc. # 55 Exs. 2–5), and makes several unsubstantiated assertions (Doc. # 50). What Plaintiff fails to do, however, is examine the contract itself–an essential exercise in a breach of contract claim. Upon close inspection of the Annuity Contract and Authorization, and after a review of all of the financial records regarding the Annuity (the accuracy of which are not disputed by Plaintiff), the court concludes that Plaintiff received everything promised to her under the Annuity contract, and thus her breach of contract claim must fail.

The material terms of the Authorization that Plaintiff signed, by which she entered into the Annuity contract, are: (1) the first-year interest rate was 5.95% consisting of a base rate of 4.95% and 1.0% "bonus rate"; (2) the minimum guaranteed rate was 3.0% after the first year and these "renewal rates" would be set by Lincoln and would not include the "bonus rate" of 1.0%; (3) there was an 8.0% surrender charge declining over six years; and, (4) the principal of the investment was guaranteed by Lincoln. (Doc. # 52 Ex. A at 23; Doc. # 52 Ex. A at 31–45; Doc. # 44 Ex. 1 at 41–42;

Doc. # 52 Ex. A at ¶ 7).  Thus, contractually, Defendant promised to credit Plaintiff's Annuity account with interest at a rate of 5.95% in the first year, and thereafter at a rate equal to or greater than 3.0%. (Doc. # 52 Ex. A at 23).  Records generated by Defendant and sent to Plaintiff regarding the Annuity account reflect that Plaintiff received 5.95% interest in the first year, which included the 1.0% "bonus rate," and 4.95% in the second year and prorated portion of the third year.  (Doc. # 52 Ex. A at 3–4, 46–52).  By signing the Authorization, Plaintiff acknowledged that an early withdrawal (before the end of six years) would result in a surrender charge, calculated according to the schedules in the Annuity contract.  (Doc. # 52 Ex. A at 34–35, 38).  The closing balance of Plaintiff's Annuity account reflects the guaranteed principal amount ($10,000), the interest earned on the Annuity (5.95% the first year, which included the first year's bonus rate of 1.0%, and 4.95% each year thereafter, for a total of $1,165.17), less the surrender charge of 7.0% ($781.77, with a credit of 10% of the surrender charge to the account per the terms of the Annuity contract, $78.18, for a total surrender charge of $703. 59), so that the ending account balance contractually should have been, and, in fact, *was exactly* $10,464.54.  (Doc. # 52 Ex. A at 48–52).  Plaintiff received a check for this amount dated April 6, 2001 (Doc. # 52 Ex. A. at 53–54), after she had surrendered her policy on March 22, 2001 (Doc. # 52 Ex. A at 15).  Defendant's records reflect, and Plaintiff does not dispute, that the surrender value of Plaintiff's account was calculated on April 6, 2001, thereby crediting her for the entire duration of the Annuity, up to and including the day the surrender check was processed. (Doc. # 52 Ex. A at 48–54).

After reviewing these facts, the court cannot locate any term of the Annuity contract or Authorization that Defendant breached.  *See, e.g.*, *S. Med. Health Sys., Inc.*, 669 So. 2d at 99 (noting that to state a valid claim for breach of contract, the plaintiff must identify the parts of the contract allegedly breached).  Although Plaintiff contends that Defendant failed to define the term "bonus,"

a material term of the contract, and thus breached the contract by "recouping the [undefined] bonus," which Plaintiff has herself defined as "something special, additional, in addition to and extra" (Doc. # 54 at 9), that assertion is off the mark.  The definition of the term "bonus" appears in the Authorization: "The initial rate is 5.95% offered for one full year and includes a **bonus rate of 1%**." (Doc. # 52 Ex. A at 23) (emphasis added).  Thus, the "bonus" is the 1.0% interest "in addition" to the first year rate of 4.95% on the Annuity.  Plaintiff's account was credited with this interest amount during the first year.  (Doc. # 52 Ex. A at 46).  The undisputed evidence shows that there was no breach of contract by Defendant as it relates to the payment of a bonus.

Notwithstanding this tautological conclusion, Plaintiff avers that the bonus was somehow "recouped" or "self-financed," and accuses Defendant of pricing the Annuity so as to cover Defendant's costs, including the costs of the "bonus rate."  Plaintiff alleges this caused Defendant to set renewal rates lower than they could have been set, thereby forcing Plaintiff to "self-finance" her own bonus, so that she did not permanently realize the "extra" 1%.  (Doc. # 54 at 10–12).  What Plaintiff refuses to recognize is that this is immaterial to whether or not Defendant breached its contract with her.  At base, it appears Plaintiff is dissatisfied with Defendant's internal pricing structure.  But Defendant's pricing methods are irrelevant to her claim.  Moreover, Defendant had no duty to disclose its pricing structure to Plaintiff upon her purchase of the Annuity, especially since Plaintiff did not request this information.  *See Langford v. Rite Aid of Ala., Inc.*, 231 F.3d 1308, 1313 (11th Cir. 2000) ("[a]s a general matter of federal law, retailers are under no obligation to disclose their pricing structure to consumers"); *State Farm Fire & Cas. Co. v. Owen*, 729 So. 2d 834, 843 (Ala. 1998) (declining to impose a duty on insurers to disclose their internal pricing structures to potential customers); *Ex Parte Ford Motor Credit Co. v. Adamson Ford, Inc.*, 717 So. 2d 781, 787 (Ala. 1997) ("declin[ing] to recognize a common law duty that would require the seller of a good or

8

service, absent special circumstances, to reveal to its purchaser a detailed breakdown of how the seller derived the sales price of the good or service, including the amount of profit to be earned on the sale"). Therefore, because she received all that she was entitled to under the contract, Plaintiff has failed to present substantial evidence of Defendant's non-performance of its agreement with her and, accordingly, her breach of contract claim must fail.

### 2. Plaintiff Has Not Proven Damages.

Further, even if Plaintiff's "bonus" definition and "recouping" arguments stated a colorable claim (and they do not), she would not be entitled to any relief from this court as she has failed to present substantial evidence that she was damaged by Defendant's actions. Thus, she cannot satisfy the fourth element of her breach of contract claim.

As discussed above, Plaintiff received everything to which she was entitled under the contract. Any charges deducted from her Annuity account were contractual surrender charges, incurred when Plaintiff voluntarily surrendered the policy. (Doc. # 52 Ex. A at 6, 15; Doc. # 44 Ex. 1 at 60, 81, 137–38, 149–50). In a breach of contract action, Plaintiff must allege specific damages that are a "natural and proximate consequence of the breach," which are typically a compensatory measure of damages "which would place [the] injured party in [the] same condition [s]he would have occupied if [the] contract had not been breached." *Brendle Fire Equipment, Inc. v. Elec. Eng'rs, Inc.*, 454 So. 2d 1032, 1034 (Ala.Civ.App.,1984); *see also Cobbs v. Fred Burgos Constr. Co.*, 477 So. 2d 335, 338 (Ala. 1985) (same); *Pyle v. Pizitz*, 110 So. 822, 826 (Ala. 1926) (holding amount lost, with interest, is limit of recovery for breach of contract to pay money). As Plaintiff received all benefits due her under the Annuity contract, she can specify no amount that would put her in the same "position [s]he would have been in had the contract been fully performed." *Cobbs*, 477 So. 2d at 338. Plaintiff *is* in the position she would have been if the contract had been fully performed

by Defendant–the only reason she did not realize the full value of the Annuity is because Plaintiff

voluntarily surrendered the policy.  This court can offer no relief for an injury not suffered.  Plaintiff

did not *lose* any amount under the Annuity, as she appears to recognize in her deposition testimony,

wherein she remarked, "I deposited ten thousand on that [annuity] and I got some back on that."

(Doc. # 44 Ex. 1 at 109) (discussing two annuities she had purchased through AmSouth and her

claim that she had not received the promised bonus).

> **B.      Lincoln Was Not in a Fiduciary Relationship with Plaintiff.**

Several of Plaintiff's claims are predicated on her allegation that a fiduciary or confidential

relationship existed between her and Lincoln, including her charge that Lincoln failed to disclose

material information and breached its fiduciary duty to her.  More specifically, Plaintiff asserts that

Defendant and/or its agents gave her "financial and investment" advice, and, therefore, "created a

clear fiduciary relationship."  (Doc. # 54 at 19).  However, a careful review of the applicable case

law and the undisputed facts reveals nothing more than a contractual relationship between the

parties.

The Alabama Supreme Court has defined a confidential relationship as one in which:

> [O]ne person occupies toward another such a position of adviser or counselor as
> reasonably to inspire confidence that he will act in good faith for the other's interests,
> or when one person has gained the confidence of another and purports to act or
> advise with the other's interest in mind; where trust and confidence are reposed by
> one person in another who, as a result, gains an influence or superiority over the
> other; and it appears when the circumstances make it certain the parties do not deal
> on equal terms, but, on the one side, there is an overmastering influence, or, on the
> other, weakness, dependence, or trust, justifiably reposed; in both an unfair advantage
> is possible. It arises in cases in which confidence is reposed and accepted, or
> influence acquired, and in all the variety of relations in which dominion may be
> exercised by one person over another.

*Holdbrooks v. Central Bank of Alabama, N.A.*, 435 So. 2d 1250, 1252 (Ala.1983) (quoting 15A

C.J.S. *Confidential* (1967)); *see also Univ. Fed. Credit Union v. Grayson*, 878 So. 2d 280, 290–91

(Ala. 2003) (quoting the same language); *K & C Dev. Corp. v. AmSouth Bank, N.A.*, 597 So. 2d 671, 675 (Ala.1992). The traditional view is that the creditor-debtor relationship of a bank and customer as well as any vendor-vendee relationship do not give rise to fiduciary duties nor create a confidential relationship between the parties. *Univ. Fed. Credit Union*, 878 So. 2d at 290; *Ex Parte Ford Motor Credit Co.*, 717 So. 2d 781, 786–87 (Ala. 1997); *Trio Broadcasters, Inc. v. Ward*, 495 So. 2d 621, 623 (Ala. 1986). However, if the case involves special circumstances such that a finding of a confidential relationship is appropriate, courts have deviated from the traditional view. *See Baylor v. Jordan*, 445 So. 2d 254, 256 (Ala. 1984); *Brasher v. First Nat'l Bank of Birmingham*, 168 So. 42, 46 (Ala. 1936).

After extensive research, the court has been able to find only one case that is both arguably similar to the present case and in which an Alabama court held that a fiduciary or confidential relationship existed. However, that decision–*Brasher v. First Nat'l Bank of Birmingham*, 168 So. 42 (Ala. 1936)–and the present case are easily distinguishable. In *Brasher*, the individual plaintiff widow was not merely purchasing an investment product from the bank or depositing funds, but had employed the bank's "trust department" *specifically to advise her on how to manage her deceased husband's estate and her own assets*.[2] The defendant bank she sued was found to have invested

---

[2]A brief excerpt from the *Brasher* court's recitation of the facts serves as a useful illustration of this point:

> [T]he plaintiff [individual] employed the defendant [bank] to advise and assist her in the probation of his [plaintiff's husband's] will and in the management of his estate, and to advise and assist her in the management, conservation, protection, and investment of her individual funds; that defendant accepted such employment and undertook to advise plaintiff and entered upon the performance of the duties of such employment . . . and plaintiff relied upon the defendant to so advise her . . . defendant was appointed as receiver to take possession of said policies [insuring the life of plaintiff's husband] and collect the insurance and hold the same subject to the further orders of the court; that the defendant as such receiver collected and received the

these funds without her knowledge or consent, and, therefore, the court concluded that it had breached a fiduciary duty to the plaintiff since a confidential relationship existed between the parties. However, in the present case, the most that Plaintiff has shown is that the Annuity sounded attractive to her after its terms were described by an AmSouth employee. (Doc. # 44 Ex. 1 at 21). The mere facts that Plaintiff had a longstanding relationship of investing through AmSouth (Doc. # 44 Ex. 1 at 64–70, 117–18, and 124–26) and may have taken its employees' advice as to what would be a good investment does not provide substantial evidence of a confidential relationship between Plaintiff and AmSouth, let alone between Plaintiff and Lincoln.

Additionally, the Alabama Supreme Court has expressly declined to find a fiduciary relationship between insurance companies such as Defendant and their customers in the context of the purchase of casualty, health, or life insurance and attempts to collect under those policies. *See e.g.*, *Nat'l Ins. Association v. Sockwell*, 829 So. 2d 111, 141 (Ala. 2002); *Quick v. State Farm Mut. Auto. Ins. Co.*, 429 So. 2d 1033, 1035 (Ala. 1983) (Torbert, C.J., concurring specially); *Metropolitan Life Ins. Co. v. James*, 191 So. 352, 355 (Ala. 1939). Even more instructive is *King v. Nat'l Found. Life Ins. Co.*, in which the plaintiffs complained that the defendant insurance company failed to disclose its internal operating procedures to plaintiffs. 541 So. 2d 502 (Ala. 1989). After finding no confidential relationship warranting extensive disclosures between the parties, the court went further to note that not only did plaintiffs not request the disclosure of such information, but also that this was not the type of information meriting disclosure in any event (absent a direct inquiry and active concealment). *Id.* at 505–506. Thus, there is no reason for this court to conclude that

---

proceeds of said policies, aggregating $100,000.

168 So. at 44.

Alabama courts would extend the definition of "confidential relationship" to include the type of arm's-length bargained purchase consummated between Plaintiff and Defendant.[3]

But even if this court were inclined to enlarge the territory of this definition beyond that of the Alabama courts, this case is not the appropriate one in which to do so.  Plaintiff admitted to having extensive investment experience and banking with several different financial institutions. (Doc. # 44 Ex. 1 at 64–70, 117–18, and 124–26).  Thus, the undisputed facts show she is not an "unsophisticated party" dependent upon the other party with "superior knowledge" any more than the typical investor or purchaser in a vendor-vendee relationship.  Further, as noted above, Plaintiff has failed to present substantial evidence that she received *any* advice from Defendant's agent (the AmSouth employee) about her investment in the Annuity, let alone extensive investment advice that could possibly serve as the basis for a confidential relationship.  (Doc. # 44 Ex. 1 at 21).

An analysis that is separate from (but related to) the determination of whether there existed a confidential relationship between the parties concerns whether or not there should have been disclosure because of the particular circumstances of the case.[4]  Even under this alternative analysis, which arguably applies a more lenient standard, this court cannot find special circumstances so as to hold the parties to a fiduciary-type relationship requiring broad disclosures and heightened candor. Such a relationship "does not arise where the parties to the transaction are knowledgeable and

---

[3]Other states have categorically refused to recognize a fiduciary relationship between insurance companies and their insureds, especially in the case of annuities.  *See, e.g.*, *Freeman v. MBL Life Assurance Corp.*, 60 F.Supp.2d 259, 266 (S.D.N.Y. 1999) (stating "the relationship between an insurance company and a policyholder is a contractual relationship, not a fiduciary one"); *Prescott v. Allstate Life Ins. Co.*, 341 F.Supp.2d 1023, 1028 (N.D. Ill. 2004).  Although not authoritative, these cases are instructive and, the court concludes, consistent with the law as pronounced by Alabama courts in cases such as *Sockwell*, *James*, and *King*.

[4]This issue is also discussed in Part IV.C.2 below.

capable of handling their affairs." *Mitchell v. Indus. Credit Corp.*, 898 F.Supp. 1518, 1535 (N.D. Ala. 1995) (citations omitted). If the court is "satisfied that the plaintiffs . . . are all capable adults who can read and write . . . [and] handle their own affairs," *id.*, as the undisputed facts show Plaintiff clearly is in this case, this is all that is necessary to avoid the strictures of a fiduciary-type relationship and additional disclosures, especially where (as here) the transaction in question was a product of arm's length negotiation.[5]

C.   **Lincoln Did Not Defraud Plaintiff Nor Fail to Disclose Any Material Fact in Connection With the Purchase of the Annuity.**

Plaintiff alleges Defendant defrauded her in making material misrepresentations and failing to disclose or suppressing material facts about the Annuity. Specifically, Plaintiff avers that the pricing structure, including Defendant's plan to "recoup" the bonus and yield spread, should have been disclosed to Plaintiff before she purchased the Annuity. (Doc. # 54 at 9). Because there are slightly different legal standards that apply when one analyzes claims of fraud on the one hand and allegations of a failure to disclose information on the other, the court will analyze each claim separately below.

1.   **Fraud.**

The framework to be used in analyzing allegations of fraud depends upon the facts and circumstances involved in the case and the relationship of the parties–fiduciary or otherwise. For the purposes of the analysis of the fraud claims in this section, the court will assume that Plaintiff

---

[5]It is axiomatic that, there being no fiduciary relationship between the parties, there is no breach of fiduciary duty, and Plaintiff's claim on this count (Count Eight) must fail.

and Defendant  were not in a fiduciary relationship, as the court concluded in subsection IV.B.[6]

Thus, the court will analyze this claim as one in which Defendant is accused of making affirmative

misrepresentations about the Annuity to Plaintiff at the time of purchase and/or fraudulently

promising Plaintiff to do something in the future (here, according to Plaintiff's allegations, allowing

Plaintiff to "permanently realize" the bonus feature of the Annuity).  Furthermore, although it could

be argued that Alabama case law is not altogether clear concerning the mental state of the defendant

necessary to find civil liability, this case does not turn on the interpretation of that element, because

the undisputed facts do not permit a finding that any misrepresentation was made, nor any fraud

perpetrated.  This is true regardless of whether Plaintiff is alleging the misrepresentation is innocent,

negligent, reckless, knowing, wanton, or intentional.[7]

---

[6] Under Alabama common law, constructive fraud is the breach of a legal or equitable duty which the law declares fraudulent "because of its tendency to deceive others, to violate public or private confidence, or to inspire public interest."  *Hornaday v. First Nat'l Bank of Birmingham, Inc.*, 65 So. 2d 678, 687 (1953).  It usually arises from a breach of duty where a confidential or fiduciary relationship exists between the parties, and does not require an intent to deceive since an innocent mistake can be actionable. *See id.* (citing 37 C.J.S. *Fraud* § 2).  However, as the Alabama Supreme Court has noted:

> If the parties are dealing at arms' length and no confidential relations exist or other duty owing to know and tell the truth, innocence and good faith in making a false representation though acted on is not a fraud.  When no legal duty exists the false representation must be knowingly or recklessly made.

*Id.*  The court will not discuss this theory of fraud as it has already concluded in subsection IV.B that Plaintiff and Defendant were not in a confidential relationship and, thus, Defendant did not owe Plaintiff any fiduciary duties.

[7] For discussions of the various *mens rea* standards, see *Hodges v. Pittman*, 530 So. 2d 817, 818 (Ala. 1988) (intent to deceive required); *Smith v. Reynolds*, 497 So. 2d 93, 95 (Ala. 1986) (innocent misrepresentations); and *Winn-Dixie Montgomery, Inc. v. Henderson*, 395 So. 2d 475, 476 (Ala. 1981) (reckless misrepresentation as distinguished from intentional).

The elements of fraud are (1) a false representation (2) of a material existing fact (3) relied upon by the plaintiff (4) who was damaged as a proximate result of the alleged misrepresentation. *P & S Bus., Inc. v. S. Cent. Bell Tel. Co.*, 466 So. 2d 928, 930 (Ala. 1985); *see also Earnest v. Pritchett-Moore, Inc.*, 401 So. 2d 752, 754 (Ala.1981). After a careful review of all the evidence on the record, the court can not find any material misrepresentations made by the AmSouth representative (*i.e.*, Defendant's agent), the only person who spoke with Plaintiff before her purchase of the Annuity, sufficient to satisfy the first element of a fraud claim. After Plaintiff had decided "[the Annuity] sounded like a good thing to put my money into," she remembers that "[the representative] offered me the bonus and everything," but she "can't remember" any other representations of any kind made by the AmSouth representative. (Doc. # 44 Ex. 1 at 21–22, 41-42, 93, 109). Further, Plaintiff admits to being aware of the material terms of the Annuity contract, which were prominent on the Authorization. (Doc. # 44 Ex. 1 at 24–38).

The Alabama Supreme Court has long held that the misrepresentation of the contents of a writing or terms of a contract, which both parties have the opportunity and ability to read and both sign, does not invalidate the writing and is not, in a legal sense, a fraud. *E.g., Dunham Lumber Co. v. Holt*, 26 So. 663, 664 (Ala. 1899). Thus, if Plaintiff is claiming a misrepresentation as to the contents of the Authorization, as well as the Annuity contract itself, her ability and opportunity to read and verify the contents of both documents, as well as her subsequent adoption of them, precludes a colorable fraud claim. Therefore, the court finds no affirmative misrepresentations made by Defendant or any of its agents at the time of the Annuity purchase.[8]

---

[8]Any other misrepresentation claim based upon the definition of "bonus" and Plaintiff's contention that it was not adequately defined at the time of purchase has been discussed by the court in subsection IV.A.1.

However, Plaintiff also avers that Defendant fraudulently misrepresented that Plaintiff would "permanently realize" the 1.0% bonus interest rate added to the base rate of the Annuity for the first year, and that such a claim was untrue because Defendant later "recouped" this bonus through the yield spread in its pricing structure. (Doc. # 54 at 9). In order to successfully allege a fraud based upon a promise to perform or abstain from performing some act in the future, two additional elements must be proved: (1) the defendant's intention, at the time of the alleged misrepresentation, not to do the act promised, coupled with (2) an intent to deceive. *Clanton v. Bains Oil Co.*, 417 So. 2d 149, 151 (Ala. 1982). Here, Plaintiff cannot present substantial evidence to establish either element. At the time of the alleged misrepresentation, Plaintiff can point only to the Authorization, which clearly indicated Defendant's intention to award Plaintiff the bonus. (Doc. # 52 Ex. A at 23). Further, Plaintiff has not presented any evidence that Defendant, at the time it promised the bonus rate to Plaintiff, intended to deceive her by not later awarding her the bonus rate. In making any contention to the contrary, Plaintiff must refer to Defendant's pricing structure, which allows it to recover its costs and make a profit on the yield spread between its contractual costs with annuitants and the investment earnings of these annuities. This is a common profit margin that exists in many types of investment companies offering various products, including annuities.[9] But the fact that Defendant reinvested what was remaining from its investment earnings after covering its operating costs–which included the cost of fulfilling its contractual obligations to Plaintiff (the only thing Defendant ever promised or represented that it would do)–and the fact that it, importantly, was that

---

[9] *See* Ivan Rudolph-Shabinsky & C. Jason Psome, *Managed Synthetics*, *in* THE HANDBOOK OF STABLE VALUE INVESTMENTS 113, 147 (Frank J. Fabozzi ed., 1998); Allan G. Richmond, *Evolution in Evaluating Life Insurance Company Credit Quality*, *in* THE HANDBOOK OF STABLE VALUE INVESTMENTS 213, 226–30, 238 (Frank J. Fabozzi ed., 1998).

reinvestment that would typically cover the cost of offering the bonus rate, does not perpetrate a fraud on the Plaintiff.

### 2. Failure to Disclose or Suppression.

In the alternative, Plaintiff argues that Defendant had a duty to disclose its pricing structure, yield spread, and intention to "recoup the bonus" to her at the time she purchased the Annuity, and the omission of these material facts constituted fraudulent suppression. The elements of suppression are: (1) a duty on the defendant to disclose a material fact; (2) the defendant's concealment or nondisclosure of that fact; (3) inducement of the plaintiff to act; and (4) action by the plaintiff to his injury. *Brushwitz v. Ezell*, 757 So. 2d 423, 431 (Ala. 2000) (citing *Foremost Ins. Co. v. Parham*, 693 So. 2d 409, 423 (Ala. 1997)). "Silence on the part of the defendant regarding a material fact is not considered suppression unless the defendant has an obligation to communicate that fact." *Id.*; *see also Hall Motor Co. v. Furman*, 234 So. 2d 37, 41 (Ala. 1970) ("To plead a case of fraudulent concealment by silence, facts should be averred from which a duty to speak arises. Such duty to speak depends upon the fiduciary or other relation of the parties, the value of the particular fact, the relative knowledge of the parties, and other circumstances of the case.") (citations omitted). "The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." ALA. CODE § 6-5-102. "In ascertaining whether the circumstances of the case created a duty to disclose, [the court] must consider a number of factors: (1) the relationship of the parties; (2) the relative knowledge of the parties; (3) the value of the particular fact; (4) the plaintiff's opportunity to ascertain the fact; (5) customs of the trade; and (6) other relevant circumstances." *State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 324 (Ala. 1999) (citation omitted). Having already determined in subsection IV.B that the parties were not in a confidential relationship and finding that there are no special circumstances in this case, the court

concludes that Defendant did not have a duty to disclose its pricing structure, yield spread, or any alleged "recouping" of the bonus interest rate.

As the Alabama Supreme Court has explained: "Our cases hold that when both parties are intelligent and dealing at arm's length, with no confidential relations, that no duty to disclose exists when information is not requested, and that mere silence is then not a fraud. There must be active concealment or misrepresentation." *Collier v. Brown*, 228 So. 2d 800, 802 (1969) (citing *Mudd v. Lanier*, 24 So. 2d 550 (1945)). The facts of the present case fit neatly within this pattern. Plaintiff and Defendant were dealing at arm's length, as vendor and customer, as Plaintiff inquired into the product when she was already at the bank branch and appeared predisposed toward purchasing the Annuity before dealing with any of Defendant's agents. (Doc. # 44 at 22). Further, "there is no duty to disclose facts when information is not requested." *Bulger v. State Farm Mut. Auto. Ins. Co.*, 658 So. 2d 425, 426. It is clear from the undisputed facts in the record that Plaintiff never requested such information prior to her purchase of the Annuity. (Doc. # 44 Ex. 1 at 22, 128). Plaintiff never discussed the subject of "spread" or "yield spread" with anyone including a representative of Defendant or AmSouth, when she purchased the Annuity, nor did she express any interest in such a discussion. (Doc. # 44 Ex. 1 at 102). Similarly, she did not endeavor to discuss how much profit Lincoln might make on the transaction with anyone, acknowledging this information was immaterial to her under the contract. (Doc. # 44 Ex. 1 at 102, 116–17, 128).

Thus, since there is no confidential relationship and the circumstances of this case do not give rise to a duty to disclose, at most, Defendant is guilty of mere silence–there being no active concealment or misrepresentation as discussed above in subsection IV.C.1. That, quite simply, is not fraud. Moreover, as discussed in connection with the breach of contract claim in subsection IV.A.1, Defendant had no duty to disclose its internal pricing or profit practices, such as the yield

spread and how the costs of the bonus rate were covered.  *See Langford v. Rite Aid of Ala., Inc.*, 231 F.3d 1308, 1313 (11th Cir. 2000) ("[a]s a general matter of federal law, retailers are under no obligation to disclose their pricing structure to consumers"); *State Farm Fire & Cas. Co. v. Owen*, 729 So. 2d 834, 843 (Ala. 1998) (declining to impose a duty on insurers to disclose their internal pricing structures to potential customers); *Ex Parte Ford Motor Credit Co. v. Adamson Ford, Inc.*, 717 So. 2d 781, 787 (Ala. 1997) ("declin[ing] to recognize a common law duty that would require the seller of a good or service, absent special circumstances, to reveal to its purchaser a detailed breakdown of how the seller derived the sales price of the good or service, including the amount of profit to be earned on the sale").  In sum, this court finds Defendant was under no duty to disclose this information to Plaintiff, and, therefore, is not liable for suppression on these facts.

### D.       Lincoln Did Not Fail to Procure a Suitable Product for Plaintiff.

After a review of the relevant statutes and case law, the court has not discovered the particular tort of which Plaintiff complains, namely "failure to procure a suitable product."  To the extent that this claim is not subsumed under an action for breach of fiduciary duty (discussed above), the court analogizes the action to the implied warranty of fitness for a particular purpose.  In Alabama, the implied warranty of fitness for a particular purpose is addressed by the Alabama Code, which states:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under Section 7-2-316 an implied warranty that the goods shall be fit for such purpose.

ALA. CODE § 7-2-315. "Thus . . . the warranty will be implied if: (1) The seller has reason to know the buyer's particular purpose; and (2) the seller has reason to know that the buyer is relying on the seller's skill or judgment to furnish appropriate goods; and (3) the buyer, in fact, relied upon the

seller's skill or judgment." *Chase v. Kawasaki Motors Corp., U.S.A.*, 140 F.Supp.2d 1280, 1289 (M.D. Ala. 2001) (citing *Donald v. City National Bank of Dothan*, 329 So. 2d 92, 95 (Ala.1976)). In an action for breach of the implied warranty of fitness for a particular purpose, the plaintiff must prove: (1) the existence of the implied warranty; (2) breach of the implied warranty; and (3) damages proximately resulting from that breach. *Barrington Corp. v. Patrick Lumber Co., Inc.*, 447 So. 2d 785, 787 (Ala.Civ.App.1984).

Applying these legal principles here, Plaintiff's complaint is that the Annuity was unsuited to her investment needs because Defendant somehow "recouped the bonus rate" and the renewal rates would have been higher were it not for the bonus feature. (Doc. # 54 at 9, 23). First, the court finds that AmSouth bank, as Lincoln's agent, did not have reason to know of Plaintiff's particular investment needs beyond the financial information and goals stated on the Authorization. The Authorization signed by Plaintiff, and which initiated the Annuity purchase, included a rough sketch of Plaintiff's financial information, including: (1) annual household income; (2) federal tax bracket; (3) net worth; (4) current cash equivalents; (5) investment objectives; (6) investment experience; (7) investment horizon; and (8) overall risk tolerance. The Authorization was provided to Plaintiff at her request, after she "was at the bank " and initially determined the Annuity "sounded like a good thing to put [her] money [into]." (Doc. # 44 Ex. 1 at 21). Plaintiff admits this is the only information she discussed with the AmSouth representative, other than the material terms of the Annuity, before purchasing the Annuity. (Doc. # 44 Ex. 1 at 21–22, 30–31). Plaintiff's investment objective was tax savings, anticipating an investment horizon of five to nine years, and she was a self-described conservative investor. It appears to the court that Plaintiff is not complaining that the Annuity does not meet these stated objectives–the only ones disclosed to Defendant. Rather, it seems Plaintiff asserts that Defendant should have known that a suitable product for Plaintiff would have been a

21

product without the bonus feature and with a different pricing schedule.  At the time of purchase, Plaintiff never mentioned (or even hinted) that she did not desire such a feature and the court finds, based upon the undisputed facts in the Rule 56 record, that Defendant had no knowledge of Plaintiff's particular desire regarding the pricing structure of her Annuity.[10]  Therefore, Defendant did not have reason to know of Plaintiff's particular purpose–not desiring a product with a pricing schedule and bonus feature like that of the purchased Annuity–and, thus, cannot be liable for failure to procure a suitable product for Plaintiff.[11]

### E.   As There Is No Colorable Breach of Contract, Fraud, or Failure to Procure a Suitable Product Claims, Defendant Cannot Be Liable for Wanton or Negligent Hiring or Supervision, Nor for Civil Conspiracy.

Plaintiff also alleges claims for negligent hiring or supervision of Defendant's employees or agents, wanton hiring or supervision of the same employees or agents, and a civil conspiracy between Defendant and its agent banks to commit fraud, suppression, negligence, wantonness, breaches of contract, and breaches of fiduciary duty.  However, having failed to prove the underlying claims of fraud and breach of contract, these claims must fail as well.  Under Alabama law, "a

---

[10]In a hypothetical sense, Plaintiff may answer by stating that she had no reason to know that this particular pricing structure and bonus feature would be unsuited to her needs until she witnessed the results.  The short answer to this is that neither did the Defendant, from the information disclosed to its representative at the time.  Further, any claim by Plaintiff that had she known this information, she would have found the Annuity to be an unsuitable product, falls under her failure to disclose and fraud claims discussed above, which the court has thoroughly considered and dismissed.

[11]Further, based upon the information Plaintiff provided Defendant in the Authorization, coupled with the fact that it was Plaintiff who first expressed an interest in the particular Annuity, the court concludes that the court cannot say that the Annuity was unsuited to Plaintiff's particular investment needs.  This was a fixed rate annuity maturing after six years, the principal was guaranteed, and the investment generated tax savings (or at least tax deferment, resulting in an increase in the future value of the tax dollars currently saved), which would seem to meet the needs of a conservative investor contemplating an investment horizon of five to nine years with a goal of tax savings.  *See, e.g.*, DAVID SHAPIRO & THOMAS F. STREIFF, ANNUITIES 3–8, 21–22, 62, 101–11 (3d ed. 2001).

company cannot be independently guilty of negligent or wanton hiring, training, or supervising in the absence of some tort committed by its employee against the plaintiffs." *McKinnes v. Am. Int'l Group, Inc.*, 420 F.Supp.2d 1254, 1259 (M.D. Ala. 2006); *see also Univ. Fed. Credit Union v. Grayson*, 878 So. 2d 280, 291 (Ala. 2003); *Voyager Ins. Cos. v. Whitson*, 867 So. 2d 1065, 1073 (Ala. 2003); *Taylor v. Stevenson*, 820 So. 2d 810, 812 (Ala. 2001). As the court has concluded that its agents at AmSouth have not committed any fraud, suppression, or breach of contract at the time of the Annuity purchase and surrender, there is no actionable tort to support a negligent or wanton hiring or supervision claim. Similarly, Plaintiff's claim of civil conspiracy must fail because there is no underlying tort or other illegal act to support the charge. The Alabama Supreme Court has often stated that a conspiracy itself furnishes no cause of action, since the foundation of the action is not the conspiracy but the underlying wrong that was allegedly committed. *E.g., Allied Supply Co., Inc. v. Brown*, 585 So. 2d 33, 36 (Ala. 1991); *see also, e.g., Massengill v. Malone Freight Lines, Inc.*, 538 So. 2d 784, 787 (Ala.1988); *Sadie v. Martin*, 468 So. 2d 162, 165 (Ala.1985). If the underlying cause of action is not viable, the conspiracy claim must also fail. *Brown*, 538 So. 2d at 36. Thus, the civil conspiracy claim also fails for lack of an underlying cause of action.

### F. Moreover, Plaintiff's Non-Fraud Tort Claims are Barred by the Statute of Limitations.

Even if Plaintiff presented a viable tort claim, each of her claims, except for those alleging fraud (here, Counts One and Two for "fraud" and "failure to disclose" respectively), is subject to a two-year statute of limitations. ALA. CODE § 6-2-38(l). There is no tolling provision for a claim for damages not involving fraud. *See Sanders v. Peoples Bank & Trust Co.*, 871 So. 2d 683, 686 (Ala. 2001) (tolling under the discovery rule applies only to fraud claims not to other tort claims such as negligence or wantonness); *Henson v. Celtic Life Ins. Co.*, 621 So. 2d 1268, 1274 (Ala.1993) (same).

23

Plaintiff's claims accrued either in 1999 when she purchased the Annuity or in 2001 when she surrendered the Annuity. Since Plaintiff did not file suit until June 30, 2005, all of her tort claims that are not based upon a fraud theory are time barred.[12]

_____

[12]Although it need not decide the issue, the court questions Defendant's argument that even Plaintiff's fraud based claims are time barred, as the tolling period under the discovery rule may or may not be applicable to this case. The relevant statute reads:

> In actions seeking relief on the ground of fraud where the statute [of limitations] has created a bar, the claim must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud, after which he must have two years within which to prosecute his action.

ALA. CODE § 6-2-3. Therefore, parties seeking recovery for a fraud claim have two years from the time of the *discovery* of the fraud in which to prosecute an action.

The Alabama Supreme Court has interpreted this provision liberally, so that "fact constituting the fraud" includes the plaintiff being aware of such facts that would alert a reasonable person to the possibility of fraud. *Ex parte American General Finance, Inc.*, 795 So. 2d 685, 689 (Ala. 2000) (concluding that in order to trigger the running of the period of limitations, plaintiff need not know all details of alleged fraud; rather, it is sufficient that plaintiff be aware of facts that would alert her to the possibility of fraud); *see also Bedwell Lumber Co., Inc. v. T & T Corp.*, 386 So. 2d 413, 415 (Ala. 1980) (citing *Williams v. Dan River Mills, Inc.*, 246 So. 2d 431 (Ala. 1971) (reaffirming the principle of the law of fraud that "knowledge of such facts which ought to excite inquiry and which, if pursued, would lead to knowledge of other facts, operates as notice of these other facts"); *Dickinson v. Moore*, 468 So. 2d 136, 138 (Ala. 1985).

Defendant is correct in asserting that Plaintiff has repeatedly testified that she surrendered the Annuity because, as of March 2001, she had concluded that she had not been told the truth and had been deceived about her purchase of the Annuity. (Doc. # 44 Ex. 1 at 60, 81, 137–38, 149–50). However, such suspicions may not be sufficient as a matter of law to put Plaintiff on notice of the fraud. Further, the Alabama Supreme Court, still speaking in *American General Finance*, explained:

> The question when the plaintiff discovered or should have discovered the fraud for statute-of-limitations purposes is generally one for the jury. [*Liberty Nat'l Life Ins. Co. v.] Parker*, 703 So. 2d [307,] [] 308 [(Ala. 1997)]. However, this Court has recognized that "there are times when this question is removed from the purview of the jury" and can be decided as a matter of law. *Kelly v. Connecticut Mut. Life Ins. Co.*, 628 So. 2d 454, 458 (Ala.1993). "The question of when a plaintiff should have discovered fraud should be taken away from the jury and decided as a matter of law only in cases where the plaintiff *actually knew of facts* that would have put a reasonable person on notice of fraud." Hicks, 584 So. 2d at 463. This Court has

**IV.     Conclusion**

For the reasons explained above, Defendant's Motion to Dismiss or for Summary Judgment

(Doc. # 50) is due to be granted as to summary judgment.   Defendant's Motions to Strike the

Affidavits of Cutlip and Ryles (Docs. # 57, 58) are moot.   The court will enter an order consistent

with this Memorandum Opinion.

**DONE** and **ORDERED** this _____12th_____ day of October, 2006.

_____

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

---

explained that "it is the knowledge of such facts that would have alerted a reasonable
person to the existence of a potential fraud, and not actual knowledge of the fraud
itself, that determines whether the question of the tolling of the limitations period in
a fraud case [under § 6-2-3] can be decided as a matter of law." *McGowan v.*
*Chrysler Corp.*, 631 So. 2d 842, 845 (Ala.1993).

*Id.* at 689 (emphasis added).  Therefore, applying these rules to the present case, the court cannot
(and need not) unequivocally state that Plaintiff had *actual knowledge* of *facts* constituting the
alleged fraud–rather than mere suspicions or dissatisfaction–which would be sufficient to take this
question from a jury so that it may be decided as a matter of law.  Again, it is not necessary for the
court to rule on this issue in order to decide this case.